UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

TERRENCE MOORE, et al.,

                        Plaintiffs,

             -v-

NEW YORK CONCRETE CORP., et al.,

                        Defendants.

------------------------------------------------------------X

18 Civ. 2791 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs, trustees of three multiemployer benefit funds, bring this action against defendants New York Concrete Corporation ("NYCC"), New Leaf Development, LLC ("New Leaf"), John Russo, and Donna Marie Russo (together with NYCC and New Leaf, "defendants"), alleging delinquent employer contributions under Sections 502 and 515 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132 and 1145 ("ERISA"), and Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185. Pending now is John Russo's motion to dismiss the seventh cause of action, pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] In that claim, plaintiffs allege that John Russo and Donna Marie Russo are principal officers of NYCC and are individually liable for NYCC's alleged ERISA violations because they used an alter ego company to fraudulently underreport contributions due under various collective bargaining agreements. For the reasons that follow, the Court denies Russo's motion.

---

[1] Unless otherwise specified, the name "Russo" is used to refer to movant John Russo. Russo's wife and co-defendant, Donna Marie Russo, does not join his motion.

## I. Factual Background

### A. Facts[2]

Plaintiffs are trustees for three multiemployer benefit funds,[3] established to benefit workers represented by three construction unions: the Local 46 Metallic Lathers and Reinforcing Ironworkers Union ("Local 46"), the Cement and Concrete Workers District Council, LIUNA ("Cement & Concrete Workers"), and Cement Masons Local 780 ("Local 780," and, together with Local 46 and the Cement & Concrete Workers, the "Unions"). Employers bound by collective bargaining agreements with the Unions are required to remit contributions to the Funds pursuant to those agreements.

Defendant NYCC is one such employer. It is a construction firm specializing in excavation, concrete foundation, and concrete superstructure work in the New York City area.

---

[2] This account is drawn from the First Amended Complaint, *see* Dkt. 30 ("FAC"), and the exhibits attached thereto, *see* Dkt. 30-1 (Ex. A, or "Local 46 Contract"), Dkt. 30-2 (Ex. B, or "Cement & Concrete Workers Contract"), Dkt. 30-3 (Ex. C, or "Local 780 Contract"), Dkt. 30-4 (Ex. D, or "Remittance Reports"). For the purpose of resolving the motion to dismiss, all factual allegations in the FAC are presumed true. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). In resolving this motion, the Court also considered Russo's memorandum of law in support of his motion to dismiss in part, *see* Dkt. 40 ("Def. Br."), plaintiffs' memorandum of law in opposition to that motion, *see* Dkt. 46 ("Pl. Br."), and Russo's reply memorandum of law, *see* Dkt. 49 ("Def. Reply Br.").

[3] In full, plaintiffs are Trustees of the Metal Lathers Local 46 Pension Fund, Metal Lathers Local 46 Trust Fund, Metal Lathers Local 46 Annuity Fund, Metal Lathers Local 46 Apprenticeship Fund, and Metal Lathers Local 46 Scholarship Fund (the "Local 46 Funds"); Trustees of the Cement & Concrete Workers Pension Trust Fund, Cement & Concrete Workers Welfare Trust Fund, Cement & Concrete Workers Annuity Trust Fund, Cement & Concrete Workers Scholarship Trust Fund, and the Cement & Concrete Workers Training and Education Trust Fund (the "Cement & Concrete Workers Funds"); and Trustees of the Cement Masons' Local 780 Pension Fund, Northeast District Council of the Operative Plasterers' & Cement Masons' International Association Annuity Fund, Northeast District Council of the Operative Plasterers' & Cement Masons' International Association Welfare Fund, and Northeast District Council of the Operative Plasterers' & Cement Masons' International Association Apprenticeship Fund (the "Local 780 Funds," and, together with the Local 46 Funds and the Cement & Concrete Workers Funds, the "Funds" or "plaintiffs").

FAC ¶ 27. It is also a member of the Cement League, a multiemployer bargaining unit that is a party to successive collective bargaining agreements with the Unions. *Id.* ¶ 11. As a member of the Cement League, NYCC is bound by those collective bargaining agreements. *Id.* Pursuant to these contracts, NYCC agrees that various kinds of specified construction work are to be performed solely by individuals represented by the Unions. *Id.* ¶¶ 13, 18, 23. NYCC is further obligated to make payments to the Funds for every hour of specified work performed on its behalf or on behalf of any alter ego, whether or not that work is performed by members of the Unions. *Id.* ¶¶ 14, 19, 24.

NYCC identifies defendant Donna Marie Russo as its owner and President, but, plaintiffs allege, NYCC is in fact owned and controlled by her husband, defendant John Russo. *Id.* ¶ 8. Plaintiffs assert that John Russo has identified himself as the "owner" of NYCC, acts as its chief operating officer, controls its operations, and negotiates labor agreements on its behalf. *Id.* He is also identified by the Cement League as NYCC's representative. *Id.* Donna Marie Russo signs and submits to the Funds, on a weekly basis, NYCC's payroll remittance reports, which state the amount of work performed by each employee covered by the CBAs. *Id.*

This dispute arises out of construction work performed in connection with the Hudson Yards project, a major real estate development on the west side of Manhattan. *Id.* ¶ 10. The Related Companies ("Related"), a non-party to this action, is a private real estate company and the general contractor or construction manager on the Hudson Yards development. *Id.* ¶ 29. Plaintiffs allege that the development "will include more than 19 million square feet of commercial and residential space" and that "more than a million hours of work on the project" would be covered by the collective bargaining agreements between NYCC and the Unions. *Id.* ¶ 28. Most of the Hudson Yards development is governed by a Project Labor Agreement

3

("PLA") between Related and the New York City Building Construction Trades Council. *Id.* But certain buildings within the larger development project are not covered by the PLA; instead, these projects are governed by the Cement League collective bargaining agreements. 50 Hudson Yards, a project within the Hudson Yards development, is one such project. *Id.* ¶ 29. In connection with this project, Related has entered into contracts with various concrete companies to perform excavation, foundation, and superstructure work. *Id.* Plaintiffs allege that "[a]ll of the prior concrete construction projects at Hudson Yards have been awarded by Related to union concrete companies such as [NYCC]." *Id.*

According to plaintiffs, Related sought to obtain "(i) the concrete construction knowledge, (ii) the concrete construction experience, (iii) the ability to obtain bonding and (iv) the ability to obtain liability insurance of a union contracting firm for the Related project at 50 Hudson Yards while at the same time paying reduced wage rates and benefits to the workers actually doing the construction work." *Id.* ¶ 30. In an effort to obtain the benefits of union labor without paying higher worker benefits, plaintiffs allege, Related has demanded that Local 46, the Cement & Concrete Workers, and other unions agree to substantial reductions in the wages and benefits due to them under the Cement League collective bargaining agreements. *Id.* ¶ 33. Plaintiffs allege that Russo and Related have worked together to demand reduced labor costs from the Unions, and that Related has used Russo and NYCC to pressure the Unions to accede to demands for reduced labor costs. *Id.* ¶ 34. For example, in 2015, Russo "brought Related to a meeting held at the offices of Local 46 between representatives of the Cement League and representatives of Local 46, the Cement and Concrete Workers and other unions for the purpose of allowing Related to demand labor cost concessions from those unions." *Id.* The Unions had made "substantial concessions" in previous negotiations, plaintiffs allege, but refused to make

4

additional concessions, demanded by Related, that would apply to the Hudson Yards concrete construction work. *Id.*

To obtain the labor concessions that Related unsuccessfully sought from the Unions, Related allegedly induced Russo—who, in plaintiffs' view, is the actual owner and controller of NYCC—to form a corporation or use an existing corporation as an alter ego entity through which NYCC could perform concrete work without having to abide by the terms of the labor contracts that bind NYCC. *Id.* ¶ 37. Related allegedly advised Russo that if he agreed to create such an alter ego not bound by the collective bargaining agreements, Russo "would get all or most of the concrete construction work to be done as part of Hudson Yards." *Id.*

Russo allegedly decided to use defendant New Leaf, a preexisting limited liability corporation, as an alter ego to perform concrete construction work at the 50 Hudson Yards project and circumvent the requirements of the collective bargaining agreements. *Id.* ¶ 39. New Leaf was formed in 2011 and, between 2011 and 2017, performed concrete construction work on small-scale residential projects. *Id.* ¶ 41. New Leaf identifies its principal as Eleonora Hroncich, *id.* ¶ 9, but, according to plaintiffs, Hroncich "has no experience in the area of concrete construction," *id.* ¶ 44. Other New Leaf executives likewise are inexperienced in the concrete construction industry. *Id.* ¶ 45. Plaintiffs allege that Russo, an experienced concrete construction worker, is New Leaf's true principal, and that New Leaf is a mere alter ego of NYCC. In support of that claim, plaintiffs allege the following: New Leaf has worked with NYCC on a small-scale construction project. *Id.* ¶ 43. New Leaf's putative headquarters, in Brooklyn, do not contain any signage indicating that New Leaf operates at that location. *Id.* ¶ 47, and there is no vehicle yard or staging area for construction equipment at that location, *id.* ¶ 48. Instead, New Leaf operates out of a Staten Island address it shares with NYCC. *Id.* ¶ 47.

Plaintiffs note that New Leaf shares this address not only with NYCC, but also with another business that Russo owns. *Id.* ¶ 49. Plaintiffs further claim that Russo has negotiated the contract between Related and New Leaf for the 50 Hudson Yards project without participation from Donna Marie Russo (the nominal principal of NYCC) or Hroncich (the nominal principal of New Leaf). *Id.* And, according to plaintiffs, since July 2017 various other NYCC executives, managers, and supervisors have migrated to New Leaf and been assigned to, and actively worked on, the 50 Hudson Yards development. *Id.* ¶ 52. New Leaf has also used NYCC property in connection with the 50 Hudson Yards project, including construction machinery. *Id* ¶ 54.

Around March 16, 2018, New Leaf began foundation work at 50 Hudson Yards. It continues to perform work that, if performed by NYCC or an alter ego, would be covered by the collective bargaining agreements. *Id.* ¶ 55. During that period, Donna Marie Russo, in her allegedly nominal capacity as principal of NYCC, has submitted remittance reports to the Funds on behalf of NYCC, but did not report any work performed at 50 Hudson Yards. *Id.* ¶ 55. The Cement & Concrete Workers Funds and the Local 780 Funds further allege that John Russo was also "responsible for creating and submitting to the Cement & Concrete Workers Funds and the Local 780 Funds . . . weekly payroll reports that purported to set forth . . . hours spent performing covered work by employees of [NYCC] . . . and its alter egos during each week." *Id.* ¶ 110.

Plaintiffs allege that the Russos, NYCC, and New Leaf entered into this deceptive, sham arrangement to avoid contributions to the Funds that NYCC owed under the collective bargaining agreements. The FAC asserts seven claims. In Claims 1, 2, and 3, each of the three Funds asserts that NYCC and New Leaf's failure to remit contributions due under the CBAs violates Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, and gives rise to an action

6

under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). *See* FAC ¶¶ 57–84. In Claims 4, 5, and 6, each of the three Funds asserts that NYCC and New Leaf's conduct violates the LMRA. *Id.* ¶¶ 85–108.

As to Claim 7—the only claim at issue in the instant motion—the Cement & Concrete Workers Funds and the Local 780 Funds allege individual liability for ERISA violations against John Russo and Donna Marie Russo. Specifically, the FAC asserts that the Russos knowingly schemed to underpay contributions due under the collective bargaining agreements to the Cement & Concrete Workers Funds and the Local 780 Funds. John Russo has moved to dismiss that claim against himself. Donna Marie Russo does not join that motion. No other claim is at issue.

### B.     Procedural History

On March 29, 2018, plaintiffs filed the complaint in this action. Dkt. 1. On May 31, 2018, Russo moved to dismiss the claims against him in his personal capacity. Dkt. 28. On June 18, 2018, plaintiffs filed the FAC and added Donna Marie Russo as a defendant. Dkt. 30. On August 1, 2018, defendants NYCC, New Leaf, and Donna Marie Russo answered the FAC. Dkts. 37–38.

Also on August 1, 2018, John Russo filed the instant motion to dismiss Claim 7, as applied to him, which seeks to hold him individually liable under ERISA for his fraudulent conduct. Dkt. 39. On August 27, 2018, plaintiffs filed their opposition to Russo's motion to dismiss. Dkt. 46. On September 11, 2018, Russo filed his reply. Dkt. 49.

## II.     Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

7

544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's [f]actual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570 (internal quotation marks omitted) (emphasis in *Arista Records*)). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

### III. Discussion

Russo argues that Claim 7 must be dismissed against him because: (1) there is no basis for personal liability against him; (2) courts in this Circuit do not recognize a cause of action for common law fraud under ERISA; and (3) plaintiffs failed to comply with Federal Rule of Civil Procedure 9(b). The Court addresses each argument in turn.

A.  **Personal Liability**

Russo first contends that Claim 7 must be dismissed against him because plaintiffs have not plausibly pled facts that support imposing personal liability on him for the alleged ERISA violations.

"[A]n individual is not liable for corporate ERISA obligations solely by virtue of his role as officer, shareholder, or manager." *Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993). However, "special circumstances, beyond an individual's officer status or corporate duties, might warrant the imposition of personal liability for a corporation's ERISA obligations." *Id.* As the Second Circuit explained in *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29 (2d Cir. 1994), *as amended* (Sept. 9, 1994), such special circumstances exist "where the defendant has committed fraud . . . or acted in concert with a fiduciary to breach a fiduciary obligation." *Id.* at 36; *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) (holding that individual corporate officers may be liable for ERISA obligations upon evidence that they acted in concert with fiduciaries in breaching fiduciary obligations, intermixed corporate and personal assets, and used corporate assets for personal benefit); *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 388 (2d Cir. 1989) (holding that "to the extent that a controlling corporate officer defrauds or conspires to defraud a benefit fund of required contributions, the official is individually liable under Section 502 of ERISA").

Plaintiffs argue that Russo is subject to personal liability because, as alleged, he fraudulently schemed to deprive the Funds of contributions owed under the Cement League collective bargaining agreements.

The Second Circuit has provided a two-part test to determine whether fraudulent conduct subjects an individual to liability for a corporation's ERISA violations. First, the individual must

be "a controlling corporate official." *Id.* Second, the individual's conduct must satisfy the elements of common law fraud: Plaintiffs must plead "'1) a material false representation or omission of an existing fact, 2) made with knowledge of its falsity, 3) with an intent to defraud, and 4) reasonable reliance, 5) that damages plaintiff[s].'" *Id.* (alteration in original) (quoting *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir. 1992)).

Turning to the first element, the Court concludes that plaintiffs have pled facts sufficient to conclude that Russo is a corporate controlling officer with respect to both NYCC and New Leaf. To determine whether an individual is a controlling corporate officer, courts look beyond the individual's title or his "status within the corporate structure"; instead, they "examine the officer's actual role in the company's affairs and relationship to the company's wrongdoing." *Lollo*, 35 F.3d at 33. In articulating this standard, the *Lollo* court suggested that an individual employee is a controlling corporate officer if he has "operational control" over the corporation and is "directly responsible for a failure to pay statutorily required wages." *Id.* at 33. Reading the FAC in the light most favorable to plaintiffs, the allegations as to Russo satisfy this standard. Plaintiffs allege that Russo has identified himself as the "owner" of NYCC, acts as its chief operating officer, controls its operations, and negotiates labor agreements on its behalf. FAC ¶ 8. The FAC develops these facts at length: Plaintiffs assert that at the time the FAC was filed, Russo held himself out as NYCC's representative to the Cement League, the multi-employer association that negotiates collective bargaining agreements between construction unions and employers. *Id.* Since 2015, Russo has acted as NYCC's "principal representative" on several specific Hudson Yards construction projects. *Id.* ¶ 31. And, plaintiffs allege, Related has actively worked specifically with Russo to bring down labor costs associated with various construction projects. *Id.* ¶ 34. Related has also communicated directly with Russo about other

10

Hudson Yards projects and allegedly advised Russo that if he could evade NYCC's contribution obligations, Russo "would get all or most of the concrete construction work to be done as part of Hudson Yards." *Id.* ¶ 37.

To be sure, Russo sharply contests these assertions. But the allegations, which the Court must take at this stage as true, establish, at a minimum, that Russo had extensive control over NYCC's day-to-day operations and was responsible for managing NYCC's labor relations and interactions with third parties. Such allegations are sufficient to support the conclusion that Russo was a controlling corporate officer at NYCC. *See Bourgal v. Robco Contracting Enters., Ltd.*, 969 F. Supp. 854, 864 (E.D.N.Y. 1997) (holding that an individual was a controlling corporate officer because he "was responsible for managing labor relations" for corporation).

For similar reasons, the Court reaches the same conclusion with respect to New Leaf. Plaintiffs have alleged that Russo identifies himself as the "50 Hudson Yards Project Manager and Operations Manager" for New Leaf, FAC ¶ 51, and that Russo negotiated the contract between Related and New Leaf for concrete services at the (large-scale) 50 Hudson Yards development project without the participation of Donna Marie Russo, the nominal head of NYCC, or Hroncich, the nominal head of New Leaf, *id.* These allegations, taken as true, establish that Russo was a controlling corporate officer at New Leaf.

As to the second element, the FAC has plausibly alleged that Russo "defraud[ed] or conspire[d] to defraud" the Funds. *Leddy*, 875 F.2d at 388. The FAC asserts that Russo, to satisfy Related's demands for reduced labor costs, conspired with Related to use New Leaf as an alter ego and thereby evade NYCC's contractual obligations to the Funds under the CBAs. FAC ¶¶ 34–39. As part of this scheme, NYCC submitted false payroll remittance reports that

11

intentionally failed to report hours worked by employees of alleged alter ego New Leaf.[4] *Id.* ¶ 55. Russo notes, and plaintiffs concede, *see* Pl. Br. at 14, that Russo did not personally sign these allegedly false remittance reports. Rather, they were signed by Russo's wife, Donna Marie Russo. But plaintiffs allege that even if Russo did not personally execute the false reports, he was responsible "for creating and submitting" them. *Id.* ¶ 110. Indeed, such false reports were a key component of the alter-ego scheme Russo allegedly devised and orchestrated. And the FAC further alleges that Russo conspired to create these false representations with knowledge of their falsity, *id.* ¶ 114, and that plaintiffs reasonably relied, to their detriment, on those false representations, *id.* ¶ 115. Crediting these allegations, a factfinder could conclude that Russo defrauded, or conspired to defraud, the Funds. *See Bourgal v. Robco Contractinv Enters., Ltd.*, 969 F. Supp. 854, 864 (E.D.N.Y. 1997) (granting summary judgment on individual liability claim where corporate officer "knowingly underreported hours worked by employees in covered employment in order to avoid paying the contractually required benefits contributions");

---

[4] Russo disputes, in passing, that the CBAs extend to work performed by an alter ego of NYCC in the first place. *See* Def. Br. at 4. The Court finds this argument unpersuasive. Plaintiffs plead that, under the relevant agreements:

> If an Employer covered by this Agreement or any such owner or principal forms or acquires by purchase, merger, or otherwise, an interest, whether by ownership, stock, equitable or managerial, in another company, corporation, partnership or joint venture, performing bargaining unit work within this jurisdiction, this agreement shall cover such other operation and such other bargaining unit Employees shall be considered an accretion to the bargaining unit.

FAC ¶¶ 21, 26. Another court in this District, interpreting identical language, concluded that the agreements "unambiguously applied to affiliated entities," including alleged alter egos. *Castaldi v. River Ave. Contracting Corp.*, No. 14 Civ. 5435 (JSR), 2015 WL 3929691, at *6 & n.5 (S.D.N.Y. June 20, 2015). The Court agrees.

*Castaldi*, 2015 WL 3929691, at *6 (same). Accordingly, the Court rejects Russo's argument that plaintiffs fail to plead any basis for a claim of personal liability against him.

### B. Common Law Fraud Under ERISA

Russo next argues that Claim 7 fails because, in effect, it is no more than an allegation of common law fraud, a claim which ERISA precludes. The Court need not address this argument at length. Russo is correct that courts in this District have declined to recognize a cause of action for common law fraud under ERISA. *See Adler v. Aztech Chas. P. Young Co.*, 807 F. Supp. 1068, 1072 (S.D.N.Y. 1992) (dismissing claim of common law fraud under ERISA); *Oechsner v. Connell Ltd. P'ship*, 283 F. Supp. 2d 926, 935 (S.D.N.Y. 2003) (same). But that is beside the point because plaintiffs do not allege common law fraud under ERISA at all. Although plaintiffs asserted a claim of common law fraud under ERISA in their original complaint, *see* Dkt. 1 (Complaint) ¶¶ 107–116, they abandoned that claim in the FAC. They now assert that Russo is individually liable under ERISA because he was a controlling corporate officer for both NYCC and New Leaf and conspired to defraud the Funds. As discussed above, the Circuit has repeatedly held that such a claim is cognizable; an individual may be personally liable for ERISA violations in certain unusual circumstances, as where the individual engages in fraudulent conduct. *See Lollo*, 35 F.3d at 29–33.

### C. Failure to Comply with Fed. R. Civ. P. 9(b)

Finally, Russo argues that Claim 7 must be dismissed as against Russo because it does not comply with the requirements of Fed. R. Civ. P. 9(b). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constitution fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The purposes of this rule is "to provide a defendant with fair notice of a plaintiff's claim, to

13

safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). To satisfy this requirement, "a plaintiff should specify the time, place, speaker, and content of the alleged misrepresentations . . . [and] explain how the misrepresentations were fraudulent and 'plead those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Caputo v. Pfizer, Inc.*, 267 F.2d 181, 191 (2d Cir. 2001) (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).

In Russo's view, plaintiffs have failed to plead Claim 7 with the requisite degree of particularity because they do not plead that Russo committed any fraudulent acts. In particular, Russo again emphasizes that plaintiffs do not allege that Russo executed any false remittance report. This contention is meritless. Plaintiffs allege that Russo was "responsible for creating and submitting" materially misleading remittance reports, FAC ¶ 110, and that these reports were part of a scheme by Russo to avoid NYCC's obligations under the CBAs by using alleged alter ego New Leaf, *id.* ¶ 112–14. These allegations amply satisfy the requirements of Rule 9(b). *See Finkel v. Lite Tron Ltd.*, No. 09 Civ. 1253 (JG)(VVP), 2010 WL 4392723, at *11–12 (E.D.N.Y. Oct. 29, 2010) (holding Rule 9(b) satisfied where plaintiff pleaded that defendant "caused to be submitted" a remittance report that underreported the number of hours worked in covered employment). They put Russo on notice of the fraud allegations against him and enable him to prepare a defense.

Russo also argues that Rule 9(b) is not satisfied because the Funds could not have relied on the allegedly false reports. Specifically, he argues, "it is impossible for the Funds to allege the element of detrimental reliance because the remittance reports they attached to the [FAC] are

14

all dated March 2018 and later, and the Funds' original Complaint is dated March 27, 2018 and was filed March 29, 2018." Def. Br. 21. This argument, too, is unavailing. At least some of the remittance reports predate the initiation of this action. *See* Remittance Reports at 1 (dated as "[r]eceived" by the Funds on March 19, 2018, 10 days before the filing of this lawsuit). The Funds were entitled to rely on the reports "to ascertain when and where members of [the Unions] are employed and to make contribution and benefits calculations . . . . That is precisely what the payroll reports are for." *Finkel*, 2010 WL 4392723, at *9. That some allegedly false remittance reports were submitted after this lawsuit was filed may be relevant to the determination of damages, but it does not go to the existence of the fraud for purposes of the analysis under Rule 9(b). In sum, therefore, the Court agrees with plaintiffs that the FAC satisfies Rule 9(b)'s pleading standard.

### D. Discovery Dispute

One final housekeeping matter remains. On January 14, 2019, the Court received from plaintiffs a letter documenting a discovery dispute—the second such dispute in recent weeks—between plaintiffs and non-parties Related Construction, LLC, The Related Companies, L.P., Hudson Yards Construction, LLC, and Hudson Yards Construction II (together, the "Related Entities"). Dkt. 59. Plaintiffs write that they served subpoenas on the Related Entities in order to explore their relationship with the Russos, NYCC, and New Leaf, but the Related Entities produced only a small number of total documents and asserted that the remaining unproduced documents were non-responsive, privileged, or personal. Plaintiffs now seek an order

15

compelling compliance with the subpoenas. On January 17, 2019, the Related Entities filed their objections to plaintiffs' request for such an order. Dkt. 60.

Specifically, Plaintiffs seek an order compelling the production of all non-privileged emails and text messages in the accounts of two custodians, Bruce Beal and Michael Trovini, that "1) contain[] the term 'Russo' or were sent to/received from any of Russo's four email addresses *and* that in any way concern the Hudson Yards projects identified in the subpoena; and 2) the allegedly personal emails (and text messages, if any) between Beal and Russo." Dkt. 59 at 2–3. Plaintiffs write that this information is directly germane to its theory of an alter-ego scheme, and that any allegedly "personal" communications between custodians at the Related Entities and Russo are relevant to plaintiffs' theory that the Related Entities induced Russo to use New Lead as an alter ego to perform work at 50 Hudson Yards in order to evade obligations under collective bargaining agreements that bind NYCC. For their part, the Related Entities argue that the requested information is irrelevant or overly burdensome to produce. They claim that the FAC concerns only work done at 50 Hudson Yards, and information as to other projects within the larger Hudson Yards development are not pertinent to that request.

The Court agrees with plaintiffs that the information sought is relevant to this action and not overly burdensome to produce. As to documents that contain the term "Russo" and concern specified projects within the Hudson Yards development, plaintiffs are correct that such documents could shed light on the relationship between NYCC, the Russos, New Leaf, and the Related Entities. Such documents are highly relevant to plaintiffs' theory that the Related

Entities induced John Russo to employ an alter-ego entity to avoid NYCC's contractual obligations.

As to allegedly "personal" exchanges between Beal and Russo, these too are relevant to the litigation. Such documents may illuminate the nature of the relationship between Russo and the Related Entities, which is directly relevant to plaintiffs' allegations that the Related Entities worked with Russo to orchestrate a scheme to avoid benefit contributions. To the extent that Beal and Trovini have such documents in their custody, they are directed to produce them. As the Court previously explained in its January 11, 2019 Order resolving an earlier discovery dispute, *see* Dkt. 58, if the Related Entities are concerned about the confidentiality of information contained in their allegedly personal communications, plaintiffs should extend the terms of the parties' confidentiality agreement to the production at issue here. Pursuant to that agreement, the Related Entities would have the right to designate as "Confidential" any document containing sensitive or private information, and could designate a document "Attorneys' Eyes Only" if it is highly likely to injure the Related Entities' competitive positions.

## CONCLUSION

For the reasons above, the Court denies Russo's motion to dismiss Claim 7 against him. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 39 and 59.

SO ORDERED.

_Paul A. Engelmayer_
Paul A. Engelmayer
United States District Judge

Dated: January 24, 2019
New York, New York