UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------------X

MICHAEL SALGO, KEVIN O'BRIEN, JAMES MAHONEY, and
GARY SIMMONS, *as Trustees of the Metal Lathers Local 46 Pension
Fund, Metal Lathers Local 46 Trust Fund, Metal Lathers Local 46
Annuity Fund, Metal Lathers Local 46 Apprenticeship Fund, and Metal
Lathers Local 46 Scholarship Fund,*

        and

ANGELO ANGELONE, KIERAN O'SULLIVAN, JOHN PETERS,
MICHAEL SALGO, KEVIN O'BRIEN, and ERIC LEE, *as Trustees of
the Cement & Concrete Workers Pension Trust Fund, Cement &
Concrete Workers Welfare Trust Fund, Cement & Concrete Workers
Annuity Trust Fund, Cement & Concrete Workers Scholarship Trust
Fund, and the Cement & Concrete Workers Training and Education
Trust Fund,*

        and

GINO CASTIGNOLI, MICHAEL RENDINA, ROBERT BERTUZZI,
EDDIE BARBARIA, FRANK MARTORANO JR., JOSEPH
MITRIONE, MICHAEL SALGO, and KEVIN O'BRIEN, *as Trustees of
the Cement Masons' Local 780 Pension Fund, Northeast District
Council of the Operative Plasterers' & Cement Masons' International
Association Annuity Fund, Northeast District Council of the Operative
Plasterers' & Cement Masons' International Association Welfare Fund,
and Northeast District Council of the Operative Plasterers' & Cement
Masons' International Association Apprenticeship Fund,*

        Plaintiffs,

        -v-

NEW YORK CONCRETE CORPORATION, JOHN RUSSO, NEW
LEAF DEVELOPMENT LLC, and DONNAMARIE RUSSO,

        Defendants.

---------------------------------------------------------------------------------X

:
:
18 Civ. 2791 (PAE)
:
OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs, trustees of three multiemployer benefits funds, bring this action against

defendants New York Concrete Corporation ("NYCC"), New Leaf Development, LLC ("New

Leaf"), John Russo, and DonnaMarie Russo (together with NYCC and New Leaf, "defendants"),

alleging delinquent employer contributions under Sections 502 and 515 of the Employee

Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132 and 1145 ("ERISA"), and

Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 ("LMRA").

Plaintiffs' claims are based on their allegation that New Leaf is in fact an alter ego of NYCC.

Pending now are motions for summary judgment from NYCC and DonnaMarie Russo and from

New Leaf and John Russo.  Defendants argue that plaintiffs have failed to uncover sufficient

evidence for a jury to find an alter ego relationship between the companies as a matter of law.

For the following reasons, the Court agrees and grants both motions in full.

## I.      Background

### A.      Facts[1]

#### 1.      The Parties

Plaintiffs are trustees for three multiemployer benefit funds (the "Funds"), established to

---

[1] The Court draws its account of the underlying facts relating to this dispute from the parties' respective submissions on the motion for summary judgment, including: plaintiffs' combined statement pursuant to Local Civil Rule 56.1 and response to defendants' 56.1 statements, *see* Dkts. 133 & 134 ("Pl. 56.1"); NYCC's Rule 56.1 statement, *see* Dkt. 110 ("NYCC 56.1"), and response to plaintiffs' Rule 56.1 statement, *see* Dkt. 141 ("NYCC 56.1 Response"); New Leaf's Rule 56.1 statement, *see* Dkt. 119 ("New Leaf 56.1"), and response to plaintiffs' Rule 56.1 statement, *see* Dkt. 143 ("New Leaf 56.1 Response"); the declaration of DonnaMarie Russo, *see* Dkt. 112 ("DMR Decl."), and attached exhibits; the affirmation of Patrick W. McGovern, Esq., *see* Dkt. 116 ("McGovern Decl."), and attached exhibits; the declaration of John Russo, *see* Dkt. 117 ("JR Decl."); the declaration of Eleonora Hroncich, *see* Dkt. 118 ("Hroncich Decl."), and attached exhibits; the declaration of James Rowland, Esq., *see* Dkt. 120 ("Rowland Decl."), and attached exhibits; the declaration of Olivia R. Singer, Esq., *see* Dkt. 126 ("Singer Decl."), and attached exhibits; the reply affirmation of Patrick W. McGovern, Esq., *see* Dkt. 139 ("McGovern Reply Decl."), and attached exhibits; the reply declaration of John Russo, *see* Dkt. 140 ("JR Reply Decl."), and attached exhibits; the reply affidavit of James Rowland, Esq., *see* Dkt. 146 ("Rowland Reply Aff."), and attached exhibit; and the parties' joint statement of undisputed facts, Dkt. 92 ("JSF").  For background facts only, the Court also cites plaintiffs' First Amended Complaint, Dkt. 30 ("FAC").

benefit workers represented by three construction unions: the Local 46 Metallic Lathers and Reinforcing Ironworkers Union ("Local 46"); the Cement and Concrete Workers District Council, LIUNA ("Cement & Concrete Workers"); and Cement Masons Local 780 ("Local 780," and, together with Local 46 and the Cement & Concrete Workers, the "Unions"). Employers bound by collective bargaining agreements ("CBA"s) with the Unions are required to remit contributions to the Funds pursuant to those agreements.

Defendant NYCC is one such employer. It is a construction firm specializing in excavation, concrete foundation, and concrete superstructure work in the New York City area. JSF ¶ 4. NYCC was founded in 1991 by John Russo and his brother Sal Russo, *id.* ¶¶ 6–7, but, since 1993, the sole shareholder has been John Russo's wife, DonnaMarie Russo, *id.* ¶ 10. NYCC is a member of the Cement League, *id.* ¶ 30, a multiemployer bargaining unit that is a party to successive CBAs with the Unions. *See id.* ¶¶ 31–33. As a member of the Cement League, NYCC is bound by those CBAs. *Id.* Pursuant to the CBAs, NYCC has agreed that various kinds of specified construction work are to be performed solely by individuals represented by the Unions. FAC ¶¶ 13, 18, 23. NYCC is further obligated to make payments to the Funds for every hour of specified work performed on its behalf or on behalf of any alter ego, whether or not that work is performed by members of the Unions. *Id.* ¶¶ 14, 19, 24.

Defendant New Leaf was formed in 2011, JSF ¶ 15, and later that same year Eleonora Hroncich became its sole owner-member, *id.* ¶¶ 20–22. Between 2011 and 2017, New Leaf only performed interior construction for residential projects in the New York City area. New Leaf 56.1 Response ¶ 60.[2] New Leaf is not a member of the Cement League. *Id.* ¶ 68. Within a few

---

[2] Citations to a party's 56.1 statement incorporate the evidentiary materials cited therein. When facts stated in a party's 56.1 statement are supported by testimonial, video, or documentary

months of John Russo joining New Leaf as an employee, New Leaf bid on and was awarded a $37 million contract to complete the excavation and concrete foundation work for the 50 Hudson Yards project in Manhattan. JSF ¶¶ 91, 109; New Leaf 56.1 Response ¶¶ 201, 214.

Defendant John Russo started NYCC in 1991 with his brother Sal, JSF ¶¶ 5–7, and became an employee in 1993 when his wife DonnaMarie Russo became the sole shareholder of the company, *see id.* ¶ 10. John Russo worked as a senior employee of NYCC, focusing on field operations, from 1993 until December 2016. NYCC 56.1 Response ¶ 56. On June 8, 2017, John Russo joined New Leaf, *id.* ¶ 164, where he remains employed today.

Defendant DonnaMarie Russo has been the President and sole shareholder of NYCC since 1993. JSF ¶ 10. She is married to John Russo. *Id.* ¶ 13.

## 2. This Dispute

This dispute arises out of construction work performed in connection with the Hudson Yards project, a major real estate development on the west side of Manhattan. The Related Companies ("Related"), a non-party to this action, is a private real estate company and the general contractor on the Hudson Yards development. *Id.* ¶ 127. Plaintiffs state that the development "w[ould] include more than 19 million square feet of commercial and residential space" and projected that "more than a million hours of work on the project" would be covered by the CBAs between NYCC and the Unions. FAC ¶ 28. While the eastern railyard portion of the Hudson Yards development is governed by a Project Labor Agreement ("PLA") between

evidence and not denied by the other party, or denied by a party without citation to conflicting admissible evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in statement required to be served by the opposing party."); *id.* Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Related and the New York City Building Construction Trades Council, other buildings within the development project are not.  JSF ¶ 128.  One such project is 50 Hudson Yards.  *Id.* ¶ 129.

In their FAC, plaintiffs alleged that, with Related's tacit approval, if not outright support, John Russo—whom plaintiffs allege is the true owner of NYCC—took control of New Leaf, an entity that had never before done commercial concrete construction work, and used it as a vehicle to bid on and win the multi-million dollar contract for excavation and foundation work at 50 Hudson Yards.  FAC ¶¶ 37–39.  In so doing, plaintiffs alleged, Russo sought to avoid NYCC's obligations under the Cement League CBAs, including its obligation to hire Union members to complete the work at 50 Hudson Yards and to make contributions to the Funds.  *Id.* Plaintiffs allege that New Leaf is an alter ego of NYCC, and that NYCC therefore owes plaintiffs Fund contributions for the 50 Hudson Yards project.

On or about March 16, 2018, New Leaf began foundation work at 50 Hudson Yards.  *Id.* ¶ 55.  Two weeks later, this lawsuit followed.  Since that time, plaintiffs allege, while NYCC has submitted remittance reports to the Funds on behalf of NYCC, it has not reported any work performed at 50 Hudson Yards.  *Id.*

The FAC contains seven claims.  In Claims 1, 2, and 3, each of the three Funds asserts that NYCC and New Leaf's failure to remit contributions due under the CBAs violates Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145, and gives rise to an action under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).  *See* FAC ¶¶ 57–84.  In Claims 4, 5, and 6, each of the three Funds assert that NYCC and New Leaf's conduct violates the LMRA.  *Id.* ¶¶ 85–108.

In Claim 7, the Cement & Concrete Workers Funds and the Local 780 Funds allege individual liability for ERISA violations against John Russo and DonnaMarie Russo.

Specifically, they assert that the Russos knowingly schemed to underpay contributions due under the CBAs to the Cement & Concrete Workers Funds and the Local 780 Funds.

Following discovery, defendants moved for summary judgment on all claims, arguing that the evidence cannot, as a matter of law, support plaintiffs' allegations that New Leaf is an alter ego of NYCC.

### B.     Procedural History

On March 29, 2018, plaintiffs filed their complaint.  Dkt. 1.  On May 31, 2018, John Russo moved to dismiss the claims brought against him in his personal capacity.  Dkt. 28.  On June 18, 2018, plaintiffs filed the FAC and added DonnaMarie Russo as a defendant.  Dkt. 30. On August 1, 2018, defendants NYCC, New Leaf, and DonnaMarie Russo answered the FAC, Dkts. 37–38, and John Russo filed a motion to dismiss Claim 7 against him, Dkt. 39; *see also* Dkt. 46 (plaintiffs' opposition); Dkt. 49 (John Russo's reply).  On January 24, 2019, the Court issued a decision denying John Russo's motion to dismiss.  Dkt. 62.  On April 5, 2019, after several extensions and a settlement conference before the Hon. Stewart D. Aaron, U.S. Magistrate Judge, fact discovery concluded.  On July 2, 2019, the parties filed the JSF for the instant motion.  Dkt. 92.  On July 16, 2019, John Russo answered the FAC.  Dkt. 97.

On July 24, 2019, NYCC and DonnaMarie Russo filed a motion for summary judgment, Dkt. 111, the DMR Declaration, Dkt. 112, a Rule 56.1 statement, Dkt. 110, and a supporting memorandum of law, Dkt. 113 ("NYCC Mem.").  The same day, New Leaf and John Russo filed their motion for summary judgment, Dkt. 114, a supporting memorandum of law, Dkt. 115 ("New Leaf Mem."), the McGovern Affirmation, Dkt. 116, the JR Declaration, Dkt. 117, the Hroncich Declaration, Dkt. 118, and a Rule 56.1 statement, Dkt. 119.  On July 25, 2019, NYCC and John Russo filed the Rowland Declaration.  Dkt. 120.  On August 13, 2019, plaintiffs filed the Singer Declaration.  Dkt. 126.  On August 28, 2019, plaintiffs filed an amended

memorandum of law, Dkt. 132 ("Pl. Mem."), an amended combined 56.1 statement and response to the NewLeaf/Russo 56.1, Dkt. 133, and an amended combined 56.1 statement and response to the NYCC/Russo 56.1, Dkt. 134. On September 9, 2019, NYCC and DonnaMarie Russo filed a reply memorandum of law, Dkt. 137 ("NYCC Reply Mem."), and a response to plaintiffs' 56.1 statement, Dkt. 141. Also on September 9, 2019, New Leaf and John Russo filed a reply memorandum of law, Dkt. 138 ("New Leaf Reply Mem."), the McGovern Reply Affirmation, Dkt. 139, the JR Reply Declaration, Dkt. 140, and a response to plaintiffs' 56.1 statement, Dkt. 143. Lastly, on September 26, 2019, NYCC and DonnaMarie Russo filed the Rowland Reply Declaration. Dkt. 146.

## II.      Legal Standards for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks, brackets, and citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

7

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III. Discussion

### A. Sufficiency of the Evidence that New Leaf is an Alter Ego of NYCC

Plaintiffs' ERISA claims are premised on the argument that New Leaf is in fact an alter ego of NYCC. As recently summarized,

> "The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). Although developed in the context of the National Labor Relations Act ("NLRA"), the doctrine applies equally to claims brought under ERISA. *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010). "The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" *Id.* (quoting *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL–CIO v. NLRB*, 261 F.3d 291, 298 (2d Cir. 2001)). "To protect employee benefits, courts observe 'a general federal policy of piercing the corporate veil when necessary.'" *Id.* (quoting *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005)).

*Moore v. Navillus Tile, Inc.*, 276 F. Supp. 3d 110, 144–45 (S.D.N.Y. 2017) ("*Navillus Tile*"), *vacated pursuant to settlement agreement*, No. 14 Civ. 8326 (CM), 2018 WL 7048697 (S.D.N.Y. Oct. 26, 2018).

An alter ego analysis is necessarily fact-specific, and a court must be "flexible" in applying it to the facts at hand. *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010). Relevant here, "[a]lthough the alter ego doctrine

is primarily applied in situations involving successor companies, where the successor is merely a disguised continuance of the old employer, it also applies to situations where the companies are parallel companies." *Navillus Tile*, 276 F. Supp. 3d 110 at 145 (quoting *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.*, 139 F.3d 304, 307 (1st Cir. 1998)). To resolve a claim that this is so, the Court must consider whether the two entities have overlapping or "substantially identical": (1) business purposes; (2) equipment; (3) customers; (4) operations; (5) management; (6) supervision, or (7) ownership. *Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir. 1996). "Not all of these factors need to be present in order to establish that two entities are alter egos, and no single factor is dispositive." *Id.* at 144; *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. A&M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d 332, 347–48 (S.D.N.Y. 2004). In addition to these seven factors, an "anti-union animus or an intent to evade union obligations," while not necessary to a finding of an alter ego relationship, may be "germane" and in some cases a "sufficient basis for imposing alter ego status." *Kombassan Holding*, 629 F.3d at 288.

The Court considers each of these factors in turn, drawing all reasonable inferences in favor of plaintiffs as the non-moving party.

### 1.  Common Business Purpose

The first factor is whether NYCC and New Leaf share a common business purpose. This factor favors plaintiffs, as a reasonable jury could easily find that they do.

"Two entities may be found to have a common business purpose when, for example, the principal work they perform is the same, particularly when that work is performed in the same geographic area. Minor distinctions in the work performed are not dispositive; thus, differentiating among entities by pointing out that one performs union work and the other does not will not defeat a finding of common business purpose." *Trs. of Mosaic & Terrazzo Welfare,*

*Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 338 (E.D.N.Y. 2017) ("*High Performance Floors*") (internal citations omitted). Similarly, "[t]hat one entity performs a type of job or project that its alleged alter ego does not" will not necessarily undercut a finding of a common business purpose. *Id.* Compare *Mason Tenders Dist. Council of Greater New York v. Fortune Interiors Dismantling Corp.*, No. 12 Civ. 4253 (PAC), 2015 WL 4503630, at *1–2, 5 (S.D.N.Y. July 23, 2015) (shared business purpose where both entities largely performed the same work), *Labarbera v. Cretty Enters., Inc.*, No. 03 Civ. 6112 (DRH), 2007 WL 4232765, at *1–2, 7 (E.D.N.Y. Nov. 28, 2007) (shared business purpose where both entities performed the same work even though each also performed other types of work), *and Mason Tenders Dist. Council Welfare Fund v. ITRI Brick & Concrete Corp.*, No. 96 Civ. 6754 (AJP), 1997 WL 678164, at *15 (S.D.N.Y. Oct. 31, 1997) (shared business purpose where both entities performed masonry construction), *with N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 650 (2d Cir. 2005) (no shared business purpose where companies "engaged in different, though related, lines of business within the freight transportation industry"), *and Lihli Fashions Corp.*, 80 F.3d at 749 (no shared business purpose where one entity manufactured clothing and the other sold and marketed it).

Here, NYCC is indisputably in the concrete construction business. It performs "excavation, concrete foundation, and concrete superstructure [projects] in the New York City area." JSF ¶ 4. And since June 2017, although New Leaf has continued its interior construction business, *see id.* ¶ 98, the overwhelming source of its revenue has come from its commercial construction work in the New York City area, *id.* ¶ 100. Drawing all inferences in favor of plaintiffs, a jury could find that this factor points in favor of finding an alter ego relationship.

## 2. Shared Equipment

The next factor to consider is whether NYCC and New Leaf "share equipment, tools, supplies, or other resources in connection with their operations." *High Performance Floors*, 233 F. Supp. 3d at 343. In other cases involving alleged alter egos, plaintiffs adduced evidence of actual equipment sharing. In *Navillus Tile*, for example, the alleged alter ego entity "'borrowed' a number of DOKA concrete forms," an expensive piece of construction equipment, for use on a construction project, "apparently without compensating [the other entity] or even alerting the company that the forms were being used." 276 F. Supp. 3d at 137, 154. Similarly, in *High Performance Floors*, the two entities' "vans and trucks were used interchangeably, without regard to [which entity] was performing the job[,]" and workers obtained both specialized machinery and personal protective equipment from a common source, regardless of their nominal employer. 233 F. Supp. 3d at 343–44; *see also Ferrara v. Happy Time Trucking, LLC*, No. 17 Civ. 7450 (ADS), 2020 WL 509145, at *10 (E.D.N.Y. Jan. 31, 2020) (finding that shared equipment, including trucks and a shared parking lot, supported an alter ego relationship). On the other end of the spectrum, the district court in *Anderson v. Union City Mirror & Table Co.* found that the shared equipment factor did not support an alter ego relationship where, "[a]side from office space at [one company], which [was] used on occasion to conduct [the other company's] business, the only 'equipment' that [the two companies were] alleged to have both used is a few stray tools and some wood." No. 16 Civ. 6012 (JMF), 2018 WL 565727, at *3 (S.D.N.Y. Jan. 25, 2018).

Here, plaintiffs have not adduced evidence from which a reasonable juror could conclude that New Leaf and NYCC have themselves shared equipment. The closest plaintiffs come is showing that both NYCC and New Leaf have rented construction equipment from DNV Equipment Corp. ("DNV"), a construction equipment rental firm owned by DonnaMarie Russo.

JSF ¶ 149.  The parties agree that the majority of DNV's business consists of equipment rentals to NYCC.  *Id.* ¶ 153.  Indeed, DonnaMarie Russo states in her declaration that DNV was formed "to serve as a bare construction equipment rental company in an effort to remove [NYCC] from potential liability . . . relating to the construction equipment [it] used" for its projects.  DMR Decl. ¶ 41.  DNV also rented equipment to New Leaf after John Russo joined New Leaf and New Leaf entered the concrete construction business.  New Leaf 56.1 Response ¶¶ 277–78.

However, DNV has not exclusively rented to NY Concrete and New Leaf.  And New Leaf has rented equipment from a number of other vendors, including Able Equipment Rental, Sunbelt Rentals, and United Rentals, none of which are alleged to have any relationship to NYCC.  *Id.*  Moreover, there is no evidence that New Leaf ever paid less than market rate for its DNV equipment rentals, or skirted normal processes in a manner that suggests a relationship other than the ordinary one of vendor-customer.  Thus, even assuming *arguendo* that DNV is an alter ego of NYCC—a question the Court need not resolve—there is no evidence of shared equipment usage between NYCC and New Leaf.  This factor therefore does not support a finding of an alter ego relationship between the two companies.[3]

### 3.    Common Customers

The next factor is whether NYCC and New Leaf shared common clients or customers.  *High Performance Floors*, 233 F. Supp. 3d at 344.  The record reflects that New Leaf's concrete construction business has had two clients so far: Related, for the 50 Hudson Yards project, and Monadnock Construction, Inc. ("Monadnock").  JSF ¶ 135–36, 165.  Although NYCC has done work for both of these entities, DMR Decl. ¶ 11; *see id.* ¶ 17, this fact is of limited significance

---

[3] NYCC stores its own construction equipment at the same location where DNV's equipment is stored.  However, DonnaMarie Russo has attested without contradiction that the two companies' equipment is stored in separate lots.  New Leaf 56.1 Response ¶ 271.

in the context of these two client companies and their industry. Related is a New York-based national developer that has touted its Hudson Yards project as "the largest development in New York City since Rockefeller Center." Singer Decl., Ex. 141. Even if this statement is discounted for a degree of puffery, it is unsurprising, given the vast scale of the Hudson Yards project, that two New York City-based concrete construction companies have done work for Related on that project. And while the record contains less information as to Monadnock, plaintiffs have not adduced evidence that it is anything other than a New York developer that works with a variety of construction firms. On plaintiffs' claim of an alter ego relationship between NYCC and New Leaf, the Court accordingly finds that this factor does not consequentially assist plaintiffs' cause. *See Navillus Tile*, 276 F. Supp. 3d at 149–50 ("The evidence in the record suggests that contractors on major construction projects in New York City all deal with a common set of customers—with some projects . . . being unionized and an increasing number of projects . . . being non-unionized. The same developers appear to operate in both spheres and developers are the ultimate source of business for both general and subcontractors. . . . [Given this context,] this particular factor [is not] . . . terribly relevant to the alter ego analysis."). This factor therefore is substantially neutral. It does not affirmatively support a finding of an alter ego relationship, but it is not inconsistent with one, either.

### 4. Shared Operations

The next factor to consider is the extent to which NYCC and New Leaf shared business operations. Overlapping "offices, telephones, computer systems, books and records, insurance policies, bank accounts, human resources, payroll systems, [or] professional services" may all be relevant to this factor. *Navillus Tile*, 276 F. Supp. 3d at 150. Also relevant is whether "[t]he companies file their own taxes . . . [or] comingle funds," *id.*, or "have made payments to each other and on each other's behalf," *id.*; *see also High Performance Floors*, 233 F. Supp. 3d

at 341; *Anderson*, 2018 WL 565727, at *3 (finding that two companies' "operations did not substantially overlap" where "[t]he companies managed separate buildings and largely respected corporate form by, among other things, filing separate tax returns and maintaining separate financial accounts").[4] At the same time, courts have cautioned against reading too much into the fact that two entities "used the same accountants, attorneys, and insurance brokers" when such service providers are available to all members of the public. *Navillus Tile*, 276 F. Supp. 3d at 150.

This factor has often been cited in support of viable alter ego claims. For example, in *High Performance Floors*, the two entities operated out of the same building and one did not pay rent to the other, "[e]mployees reported their hours worked for either company to [a single person] . . . on the same timesheets," and "on at least one occasion, checks from customers made out to [one entity] were deposited into the other's account." 233 F. Supp. 3d at 341–42. And in *Navillus Tile*, the corporate credit card of one entity was used to pay the incorporation fees for the other, and that same entity served as a corporate immigration sponsor for at least two employees and "provide[d] health insurance to several employees for months after they formally left the company and moved to" the alter ego. 276 F. Supp. 3d at 154.

Here, plaintiffs have not adduced non-speculative evidence of shared operations by NYCC and New Leaf. There is no evidence of shared phones or computer systems, records, or payroll. Nor is there evidence of financial comingling. Plaintiffs instead argue that a jury could find shared operations from the fact that, between 2011 and 2015, some two years before John Russo joined New Leaf, New Leaf rented office space in the same building as NYCC (the "Brick Court" address). JSF ¶ 116. Plaintiffs further point out that New Leaf's landlord in this building

---

[4] Evidence of financial integration may also be circumstantial evidence of common ownership.

was a company owned in part by John Russo. *Id.* ¶ 117. But the parties have also stipulated that New Leaf did not share office space with NYCC during its tenancy at Brick Court, *see id.* ¶ 120, and indeed has never shared premises with NYCC at any other time, *see id.* ¶¶ 121–25. The Court finds this fact largely irrelevant because it predates the relevant events. In any event, it is insufficient, without some other evidence assisting plaintiffs, to support a finding of overlapping operations.

In the absence of any solid evidence of concurrent or overlapping operations, plaintiffs argue that John Russo's use of a NYCC cost analysis spreadsheet on behalf of and while working for New Leaf in July 2017 is evidence of the companies' overlapping operations. New Leaf 56.1 Response ¶ 387. New Leaf admits that the spreadsheet was used. But, it notes, the spreadsheet itself does not refer to NYCC. *Id.* This single event is far too thin a reed from which a jury could find overlapping operations. Even assuming *arguendo* that the unremarkable spreadsheet was somehow proprietary—something that plaintiffs have neither alleged nor established—its use by Russo, on the record at hand, is consistent with carelessness and cannot, other than by speculation, be viewed as indicative of more. Viewing it in the light most favorable to the plaintiffs, this fact is too insubstantial to support a finding of overlapping operations.

Because plaintiffs have failed to adduce any evidence of overlapping operations, this factor does not support finding an alter ego relationship between NYCC and New Leaf.

### 5. Shared Management

The next factor the Court must consider is whether NYCC and New Leaf had overlapping management. "Two companies may be found to be alter egos for purposes of ERISA . . . when the same individuals are involved in the ownership, management, and supervision of the entities. Alter ego . . . status may also be found where distinct entities share employees." *High Performance Floors*, 233 F. Supp. 3d at 338 (internal citations omitted); *see also Gesualdi v.*

*Juda Constr., Ltd.*, No. 10 Civ. 1799 (RMB), 2011 WL 5075438, at *8 (S.D.N.Y. Oct. 25, 2011)

(finding that overlapping corporate officers supported an alter ego relationship)

Plaintiffs argument as to this factor relies on the proposition that "[w]here two companies share a large number of employees, particularly managers, . . . this can be evidence of alter ego status." *Navillus Tile*, 276 F. Supp. 3d at 153 (brackets omitted). While this proposition of law is correct, it is not implicated by the facts adduced during discovery.

Here, the evidence is clear that John Russo managed the field operations for NYCC. New Leaf 56.1 Response ¶ 351 ("John Russo was 'in charge of all field operations' and was the 'boss of the field.'" (citation omitted)). And it is undisputed that, after he joined New Leaf in June 2017, John Russo managed New Leaf's concrete construction business. JSF ¶ 99. Indeed, there appears little question that New Leaf would not have obtained the Related contract without the benefit of Russo's name and credibility: Before John Russo joined New Leaf, the company had never completed a construction project, *id.* ¶ 25, but within months of his joining it had won a $37 million bid proposal for the 50 Hudson Yards project, *id.* ¶ 109; New Leaf 56.1 Response ¶¶ 201, 214.

Central here, however, plaintiffs have not adduced any evidence that John Russo, officially or unofficially, ever served in a management role for NYCC and New Leaf at the same time. Russo's move from one company to another does not make the companies alter egos. And the record is similarly devoid of evidence that any senior NYCC employees simultaneously worked for New Leaf, that any NYCC employees were seconded to New Leaf projects while continuing to officially work for NYCC, or even that any of the former NYCC employees who followed Russo to New Leaf have since returned to NYCC. *See* JSF ¶ 96 ("At no time has any New Leaf employee or personnel been simultaneously employed by either NYCC or Related.").

There is, accordingly, no evidence that NYCC and New Leaf have ever "shared" any employees. This factor, too, disfavors a finding of an alter ego relationship.

### 6. Shared Supervision

The next factor is whether there was overlapping supervision of employees or projects at NYCC and New Leaf. *High Performance Floors*, 233 F. Supp. 3d at 338. Plaintiffs' arguments on this point fail for substantially the same reasons as their arguments related to overlapping management. The fact that former NYCC employees were *subsequently* employed in similar roles by New Leaf, with no evidence of overlap or simultaneous duties, is insufficient as a matter of law to support a finding of an alter ego relationship. *See* JSF ¶ 96 ("At no time has any New Leaf employee or personnel been simultaneously employed by either NYCC or Related."). Therefore, this factor also fails to support plaintiffs' claims.

### 7. Common Ownership

#### a. Ownership

The penultimate factor is whether there is overlapping ownership of NYCC and New Leaf. *Kombassan Holding*, 629 F.3d at 288–89; *see also Happy Time Trucking*, 2020 WL 509145, at *10 (common ownership supports finding alter ego relationship); *Navillus Tile*, 276 F. Supp. 3d at 145–47, 151–53 (same); *Gesualdi*, 2011 WL 5075438, at *8 (same). The evidence produced in discovery does not support a finding that there is. Although the original shareholders of NYCC were John and Sal Russo, JSF ¶¶ 6–7, the parties have stipulated that DonnaMarie Russo has been the sole shareholder since 1993, *id.* ¶¶ 9–10, 12. As to New Leaf, the parties have stipulated that it was formed as an LLC in March 2011 by Joseph Scarpinito, *id.* ¶ 15, who was at that time its sole owner, *id.* ¶ 16. Later that same year, the parties stipulate, Eleonora Hroncich became the sole owner-member of New Leaf, *id.* ¶ 20, and

since that time has been its only member, *id.* ¶¶ 20–22.  Based on the parties' joint stipulations, there is no dispute that John Russo is not and has never been an owner of New Leaf.

The parties have further stipulated that Hroncich "has never been employed by [NYCC] or any business unit" thereof, *id.* ¶ 28, and that DonnaMarie Russo has also "never been employed by New Leaf or any business unit of New Leaf," *id.* ¶ 27.  The parties also agree that "Hroncich is not related, and has never been related, by blood or marriage, to DonnaMarie Russo, John Russo, or Sal Russo."  New Leaf 56.1 Response ¶ 76.  There is therefore no familial link between the ownership of the two companies, either.  Because New Leaf's ownership from its inception to the present is undisputed, and does not overlap with John Russo, DonnaMarie Russo, or NYCC, there is no overlapping ownership of the two entities.

Plaintiffs arguments to the contrary are unavailing.

First, plaintiffs point to John Russo's management of NYCC's field operations.  *See id.* ¶ 351.  This fact, however, while potentially relevant to the analysis of overlapping management or supervision, does not establish his legal ownership of NYCC.  More to the point, even if John Russo were assumed on this basis to own NYCC, this would not establish his ownership of New Leaf, in which the evidence does not suggest either Russo has an ownership interest.[5]  Given that, whether John Russo owns NYCC alongside DonnaMarie Russo is immaterial to the alter ego analysis, which concerns overlapping or concurrent ownership across the two companies.[6]

---

[5] For this same reason, plaintiffs' argument based on John and DonnaMarie Russo's joint tax returns is beside the point.  Plaintiffs argue that because DonnaMarie is the sole shareholder of NYCC and the couple files joint tax returns, John Russo should be deemed an owner of NYCC.  Even if this argument were accepted, it would not help establish *overlapping* ownership of NYCC and New Leaf.

[6] This same analysis applies to the single piece of email evidence on which plaintiffs rely: an email dated April 12, 2017, in which John Russo ambiguously uses the expression "we own" in

Second, plaintiffs state that John Russo has "dominated" New Leaf's concrete construction business. That characterization, however, does not support a finding of ownership in New Leaf by Russo, who is unrelated to Hroncich, New Leaf 56.1 Response ¶ 76; has no recorded ownership interest in New Leaf; receives only a salary, *see id.* ¶¶ 182, 194; and has never received a bonus, received a profit-sharing contribution, or had any other discernible financial interest in the company besides that of an employee, *see id.* ¶¶ 74, 75, 182.

Third, plaintiffs point to cases where common ownership has been found on the basis of a familial relationship between the nominal owners of two entities. As plaintiffs concede, however, other facts in these cases supported an alter ego finding. *See* Pl. Mem. at 20 ("In *Castaldi v. River Ave. Contracting Corp.*[,] . . . Judge Rakoff held that *where 'there are numerous indicia of alter ego status*, close family connections between companies can satisfy the 'continuity of ownership' factor.'" (emphasis added) (quoting No. 14 Civ. 5435 (JSR), 2015 WL 3929691, at *5 (S.D.N.Y. June 22, 2015)); *see also Anderson*, 2018 WL 565727, at *2 ("[A] close familial relationship creates a presumption of alter ego status only where all evidence points toward an alter ego finding except the fact that the companies are not owned by the same people. In such circumstances, courts use the fact that the owners are members of the same immediate family and the companies closely held as a proxy for identical ownership. Where the other relevant factors do not point toward alter ego liability, however, there is no basis to impute common ownership to close family members." (internal quotation marks, citations, and

---

reference to a list of construction equipment, which plaintiffs allege is owned by either NYCC or DNV. Pl. Mem. at 18–19. Even drawing all inferences in plaintiffs' favor, this would tie John Russo to the ownership of NYCC, but would not make him an owner of New Leaf or show concurrent or overlapping ownership of NYCC and New Leaf.

alterations omitted)).  In any event, given the fact, acknowledged by plaintiffs, that there is no familial relationship between Hroncich and any of the Russos, this line of cases is inapposite.[7]

Fourth and finally, plaintiffs fall back on a series of *ipse dixit* arguments.  In numerous responses to defendants' substantiated Rule 56.1 factual propositions, plaintiffs assert a genuine dispute of material fact by reciting conclusory statements along these lines:  "Disputes . . . because NYCC is an alter ego of New Leaf," or "[d]isputes . . . [because] John Russo dominated and controlled New Leaf and Hroncich was a mere figurehead."  *See* New Leaf 56.1 Response ¶¶ 35, 73, 182, 183, 202, 207, 245, 291, 317–19, 328–29; NYCC 56.1 Response ¶¶ 103, 113.  In the same vein, plaintiffs do not admit the ownership structures of NYCC and New Leaf, as reviewed above, on the ground that these structures exist only "on paper."  NYCC 56.1 Response ¶¶ 4, 5, 8, 27, 61; New Leaf 56.1 Response ¶¶ 16, 18, 22, 23, 24, 30.  Absent factual support, such conclusory statements cannot carry the day at summary judgment.

The Court therefore finds that the factor of common ownership does not favor a finding of alter ego status.

### b.    *De facto control*

Plaintiffs argue that notwithstanding the dearth of evidence of an overlapping ownership of NYCC and New Leaf—and notwithstanding the affirmative documentary evidence to the contrary—the Court must look beyond such "paper" ownership to determine if there is a *de facto* overlap in ownership of the two companies.  Pl. Mem. at 17–20.

---

[7] The cases cited by plaintiffs in which an alter ego relationship was alleged between a shuttered company and its alleged successor-in-interest are also less apposite here, where both companies still exist.  In this context, the alter ego issue, as reflected in the foregoing analysis, turns on whether there is overlapping or concurrent ownership, management, personnel, operations, and equipment.

Plaintiffs, however, misread the case law in claiming that de facto control may alone establish an alter ego relationship. In at least two cases on which plaintiffs rely, *A & P Brush Manufacturing Corp. v. NLRB*, 140 F.3d 216, 218 (2d Cir. 1998), and *J.M. Tanaka Construction, Inc. v. NLRB*, 675 F.2d 1029, 1032–33, 1035 (9th Cir. 1982), the courts relied in part on close familial relationships to find common ownership. In *Fugazy Continental Corp. v. NLRB*, 725 F.2d 1416, 1420 (D.C. Cir. 1984), and *NLRB v. Scott Printing Corp.*, 612 F.2d 783, 785, 786–87 (3d Cir. 1979), the courts concluded that all the other factors besides ownership pointed toward a finding of an alter ego relationship. The D.C. Circuit further noted in *Fugazy*, 725 F.2d at 1420, as in *J.M. Tanaka*, 675 F.2d at 1034–35, that the owner of one company had a financial stake in the other. Finally, in *Barbera v. R. Rio Trucking*, the district court found that disputed material facts precluded summary judgment because it was unclear from the record who owned the alleged alter ego: the owner of the other company or his brother. No. 03 Civ. 1508 (SLT), 2010 WL 3928553, at *12 (E.D.N.Y. Sept. 30, 2010).

The cases on which plaintiffs rely instead stand for the uncontroversial propositions that (1) common ownership is but one of seven factors to be considered as part of the overall alter ego analysis, and (2) familial relationships can support a finding of shared ownership. These cases do not support plaintiffs' notion that, in a case where the uncontroverted documentary evidence reflects separate ownership and where there is no evidence of a familial relationship between the two companies' separate owners (Hroncich and the Russos), a jury could disregard this proof and find common ownership.

### 8.    Anti-Union Animus

The final factor for the Court to consider is whether the evidence suggests an anti-union animus or motivation in the creation of the alleged alter ego company. Although not strictly part of the seven-factor alter ego analysis, such evidence is nevertheless "germane." *Kombassan*

*Holding*, 629 F.3d at 288.  And the Second Circuit has suggested that such evidence, if strong

enough, may be sufficient in and of itself to support a finding of an alter ego relationship.  *Id.*

(citing *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 12 (2d Cir. 1984)).

The evidence of anti-union animus in this case, however, while present, is both limited

and offset by contrary evidence.  The evidence shows that NYCC has, traditionally, bid only on

union closed shop projects, *see* NYCC 56.1 Response ¶ 104, and all NYCC employees who

work on its projects are union workers, *id.* ¶ 83.  And unlike the paradigmatic alter ego case in

this area, in which an existing union-employing business is closed and is succeeded by a new,

non-union business,[8] it is undisputed that NYCC continues to exist and continues to employ

union labor.

Moreover, although New Leaf is not a member of the Cement League, the record

evidence is that it has used union labor on at least one occasion since John Russo was hired.  The

parties agree that New Leaf used labor from the Carpenters Union on the $37 million 50 Hudson

Yards project, *id.* ¶ 109, and made contributions to the Carpenters Union benefit funds for that

work, *id.* ¶ 110.  This undisputed fact undermines plaintiffs' central thesis that John Russo left

---

[8] *See, e.g.*, *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942); *NLRB v. Mastronardi Mason Materials Co.*, 64 F. App'x 271, 273 (2d Cir. 2003); *A&P Brush Mfg. Corp.*, 140 F.3d at 219; *NLRB v. Amateyus, Ltd.*, 817 F.2d 996, 998 (2d Cir. 1987); *Goodman Piping Prods., Inc.*, 741 F.2d at 11; *Fugazy Cont'l Corp.*, 725 F.2d at 1418; *J.M. Tanaka Const.*, 675 F.2d at 1032–33; *Scott Printing Corp.*, 612 F.2d at 785; *Bd. of Trs. of the Heat & Frost Insulators Local No. 33 Pension Fund v. D&N Insulation Co.*, No. 11 Civ. 1998 (JAM), 2015 WL 5121458, at *7–8 (D. Conn. Aug. 31, 2015); *Jacobson v. Metro. Switchboard Co.*, No. 05 Civ. 2224 (JFB), 2007 WL 1774911, at *3–4, 6–7 (E.D.N.Y. June 18, 2007); *Bricklayers & Allied Craftworkers Local 2 v. C.G. Yantch, Inc.*, 316 F. Supp. 2d 130, 143–44 & n.10 (N.D.N.Y. 2003); *LaBarbera v. C. Volante Corp.*, 164 F. Supp. 2d 321, 324 (E.D.N.Y. 2001); *Plumbers, Pipefitters & Apprentices Local Union No. 112 Pension, Health & Educ. & Apprenticeship Plans ex rel. Fish v. Mauro's Plumbing, Heating & Fire Suppression, Inc.*, 84 F. Supp. 2d 344, 350–51 (N.D.N.Y. 2000).

NYCC and joined New Leaf to enable it to be used as a vehicle to hire non-union labor to complete work at Hudson Yards.

Viewing the evidence in the light most favorable to plaintiffs, while the inference could be drawn of a desire by New Leaf not to do business with *plaintiffs'* unions, a finding of anti-union animus is a bridge too far. The evidence adduced by plaintiffs does not support that. It is a far cry from the level of proof of anti-union animus that might justify finding an alter ego relationship standing on its own.

### 9. The Evidence in Totality

Viewed in the light most favorable to plaintiffs, the evidence only supports one factor that affirmatively favors finding an alter ego relationship between NYCC and New Leaf: their shared business purpose of working in concrete construction in the New York City area. For the reasons stated, this factor alone cannot support a finding of an alter ego relationship between two entities. None of the other factors affirmatively support finding such a relationship here. For several factors, like management and supervision, plaintiffs have adduced evidence of a degree of commonality—for example, identifying individuals who left NYCC to later work at New Leaf, but plaintiffs have not shown any overlapping employment of personnel, or instances where employees left NYCC to work for New Leaf for a short period and then returned to NYCC. For other factors, including those relating to operations, equipment, and ownership, plaintiffs have not adduced any evidence of overlap of any kind. Plaintiffs have not adduced sufficient evidence on which a reasonable jury, other than by speculation and supposition, could find that an alter ego relationship exists, or has existed, between NYCC and New Leaf.

The Court therefore finds as a matter of law that, on the record established, NYCC and New Leaf cannot be found to be alter egos. *See, e.g.*, *Express Servs., Inc.*, 426 F.3d at 649–50; *Anderson*, 2018 WL 565727, at *2; *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension*

*Fund v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 9112 (PKC), 2017 WL 3738741, at *9

(S.D.N.Y. Aug. 30, 2017), *aff'd sub nom. Div. 1181 A.T.U.-N.Y. Emps. Pension Fund by*

*Cordiello v. City of N.Y. Dep't of Educ.*, 910 F.3d 608 (2d Cir. 2018); *Fortune Interiors*

*Dismantling Corp.*, 2015 WL 4503630, at *5; *Trs. of Empire State Carpenters Annuity,*

*Apprenticeship, Labor-Mgmt. Co-op., Pension & Welfare Funds v. JJJ Concrete Corp.*,

No. 13 Civ. 4363 (SJF) (ARL), 2015 WL 790085, at *9 (E.D.N.Y. Feb. 24, 2015); *A&M*

*Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d at 350; *In re:*

*Staying Arbitration & Vacating Notice of Intention to Arbitrate Between Armen Digital*

*Graphics, Ltd., Amalgamated Lithographers of Am., Local One*, No. 96 Civ. 5844 (LBS),

1997 WL 458738, at *7–9 (S.D.N.Y. Aug. 12, 1997); *Mason Tenders Dist. Council Welfare*

*Fund v. Kan Klean Indus., Inc.*, No. 92 Civ. 7688 (AGS), 1996 WL 447751, at *6–8

(S.D.N.Y. Aug. 7, 1996). This finding requires granting summary judgment in favor of NYCC

and New Leaf on their motions for summary judgment on the claims (1 through 6) against them,

and denying plaintiffs' corresponding motions.

### B.       Claims Against John and DonnaMarie Russo Individually

The FAC's seventh claim, brought by the Cement & Concrete Workers Funds and the

Local 780 Funds, seeks to hold John and DonnaMarie Russo personally liable for NYCC's

alleged ERISA violations. As plaintiffs acknowledge, this claim, too, turns on the theory of an

alter ego relationship between NYCC and New Leaf. Pl. Mem. at 27 ("Issues of personal

liability, of course, arise only if Plaintiffs succeed in proving their case that New Leaf and

NYCC are alter egos."). Because the Court has found insufficient evidence to find such a

relationship as a matter of law, this claim also cannot survive. The Russos' motion for summary

judgment as to this claim accordingly must be granted, and plaintiffs' corresponding claim

denied.

## CONCLUSION

For the reasons set out above, the Court grants defendants' motions for summary judgment in full. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 92, 111, and 114, and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 20, 2020
New York, New York